

Villanova University School of Law Digital Repository

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-12-2002

# In Re: PWS Holding Corp

Precedential or Non-Precedential: Precedential

Docket No. 01-1462

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"In Re: PWS Holding Corp " (2002). *2002 Decisions.* Paper 563.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/563

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed September 12, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-1462

IN RE: PWS HOLDING CORPORATION;
BRUNO'S, INC.;
FOOD MAX OF MISSISSIPPI, INC.;
A.F. STORES, INC.;
BR AIR, INC.;
FOOD MAX OF GEORGIA, INC.;
FOOD MAX OF TENNESSEE, INC.;
FOODMAX, INC.;
LAKESHORE FOODS, INC.;
BRUNO'S FOOD STORES, INC.;
GEORGIA SALES COMPANY;
SSS ENTERPRISE, INC.,

Debtors,

Wyatt R. Haskell, individually and on behalf
of others similarly situated,

Appellant

On Appeal from the United States District Court
for the District of Delaware Exercising Original
Jurisdiction in a Bankruptcy Case

District Court Judge: The Honorable Sue L. Robinson
(D.C. No: 98-00212 through 98-00223)

Argued on April 1, 2002

Before: SLOVITER, FUENTES, and MICHEL,*
Circuit Judges.

_____

* Hon. Paul R. Michel, United States Court of Appeals for the Federal
Circuit, sitting by designation.

(Opinion Filed: September 12, 2002)

J. VERNON PATRICK (Argued)
JEFFREY V. HAVERCROFT
Haskell Slaughter Young &
 Rediker, L.L.C.
1200 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, AL 35203

Counsel for Appellant Haskell

HARVEY R. MILLER (Argued)
LORI R. FIFE
Weil, Gotshal & Manges LLP
767 Fifth Avenue
27th Floor
New York, NY 10153

DANIEL J. DeFRANCESCHI
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

 Counsel for Appellees
PWS Holding Corp., Bruno's, Inc.,
et al.

AMY R. WOLF (Argued)
HAROLD S. NOVIKOFF
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019

EDWARD G. BIESTER, III
Duane, Morris & Heckscher, LLP
One Liberty Place
Philadelphia, PA 19103-7396

 Counsel for Appellee
Chase Manhattan Bank

2

OPINION OF THE COURT

FUENTES, Circuit Judge:

Wyatt R. Haskell appeals from the order of the District Court enforcing its previous confirmation order ("Confirmation Order") of a bankruptcy reorganization plan ("Reorganization Plan") for Bruno's, Inc., an Alabama-based company that operates a chain of supermarkets in the southeastern United States. The order specifically enjoins the prosecution of certain fraudulent transfer claims asserted by Haskell in Alabama state court. The District Court further ordered that, as a result of Haskell's violation of the Confirmation Order, he is to pay the costs associated with obtaining the enforcement order. As a holder of $2.45 million in Bruno's subordinated notes, Haskell argues that the Reorganization Plan and the Confirmation Order do not bar him from pursuing direct fraudulent transfer claims under the Alabama Uniform Fraudulent Transfer Act ("AUFTA"), Ala. Code, S 8-9A-1, et. seq.

Because the fraudulent transfer claims asserted by Haskell in Alabama state court were extinguished by the Reorganization Plan and Confirmation Order, and because Haskell continued to prosecute the Alabama action in violation of the Confirmation Order, we will affirm the

District Court's enforcement order in all respects.

I.

Bruno's operates a chain of about 200 supermarkets in the southeastern United States. In 1995, affiliates of Kohlberg, Kravis, Roberts & Co., LP ("KKR") acquired an 83.33% interest in Bruno's in a leveraged recapitalization, which was financed by an equity contribution of $250 million by KKR, a revolving credit and term loan facility provided by a group of banks (the "Banks"), and the issuance by Bruno's of $400 million in notes due in 2005 pursuant to an indenture. The indenture provides that the noteholders' claims are fully subordinated to the payment in full of the claims of the senior lenders. The total

3

financing of the leveraged recapitalization was approximately $1.25 billion.

From November 1997 through March 1999, Haskell purchased $2.45 million in principal amount of subordinated notes, at an average cost of 20 to 22 cents on the dollar, or $490,000 to $539,000 in the aggregate.

On February 2, 1997, facing difficulty meeting payment obligations from the recapitalization and in paying its suppliers and other creditors, Bruno's and its affiliates1 (collectively "Debtors") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. As of that filing date, Bruno's owed approximately $462 million to the Banks, $135 million to trade vendors, suppliers, and other secured creditors, and $421 million on the subordinated notes. In February 1998, the Bankruptcy Trustee appointed a nine-member "Official Unsecured Creditor's Committee" (the "Committee"), which comprised four representatives of the Banks, three representatives of the trade vendors, and two representatives of the subordinated noteholders. During the spring of 1999, the Committee and subgroups of the Committee convened several times to develop the Reorganization Plan for the Debtors.

In March 1999, the Debtors' attorneys determined that legal claims arising from the leveraged recapitalization, primarily fraudulent transfer claims, were not viable against any of its participants. Although the Committee initially voted to preserve these causes of action in the plan, it reversed its position in May 1999 and, with the support of the trade vendor representatives and the Banks, voted to support the plan releasing the claims. Haskell, W.R. Huff Asset Management Co., L.L.C. ("Huff "), a holder of $290 million in Bruno's subordinated notes, and HSBC Bank USA ("HSBC"), the indenture trustee for the subordinated notes, objected to these releases and successfully moved for the appointment of an independent examiner to evaluate the claims. The examiner found, however, that the claims

1. The affiliates are PWS Holding Corp., Food Max of Mississippi, Inc., A.F. Food Stores, Inc., BR Air, Inc., Food Max of Georgia, Inc., Food Max of Tennessee, Inc., FoodMax, Inc., Lakeshore Foods, Inc., Bruno's Food Stores, Inc., Georgia Sales Co., and SSS Enterprise, Inc.

were "not promising," were "limited and speculative," and that "significant defenses" were available to each of the principal participants, the former shareholders, the Banks, the subordinated noteholders, and KKR in the recapitalization. The examiner thus concluded that the fraudulent transfer claims were "extremely difficult to justify" in the face of "the multiple legal and factual obstacles to any substantial fraudulent transfer or illegal distribution recovery by the Debtors." Accordingly, under the Reorganization Plan, these legal claims were extinguished and the potential targets of any prosecution of these claims were, in effect, released.

On August 5, 1999, Haskell commenced an action in Alabama state court ("Haskell Alabama Action") on behalf of himself and similarly situated noteholders, asserting claims under the AUFTA, alter-ego claims, conspiracy claims, and breach of fiduciary duty claims. The defendants in the Haskell Alabama Action consist primarily of participants in the leveraged recapitalization, including co-appellee The Chase Manhattan Bank ("Chase"), which served as administrative agent for the senior lenders to Bruno's in the leveraged recapitalization. In response, Bruno's invoked the automatic stay under 11 U.S.C. S 362 of the Bankruptcy Code, and the prosecution of the Haskell Alabama Action was suspended.

The final Reorganization Plan explicitly makes reference to the Haskell Alabama Action, providing:

>      9.3 Claims Extinguished.
>
>      (a) As of the Effective Date, any and all avoidance
>      claims accruing to the Debtors and Debtors in
>      Possession under sections 502(d), 544, 545, 547, 548,
>      549, 550, and 551 of the Bankruptcy Code, including,
>      without limitation, all of the claims that are asserted in
>      the Haskell Alabama Action and the Huff Alabama
>      Action, shall be extinguished whether or not then
>      pending.
>
>      (b) As of the Effective Date, any and all alter-ego or
>      derivative claims accruing to the Debtors and Debtors
>      in Possession, including, without limitation, all of the
>      claims that are asserted or could be asserted in the

>      Haskell Alabama Action and the Huff Alabama Action,
>      shall be extinguished whether or not then pending.

App. IV, at 773 (emphasis added). Haskell, together with Huff and HSBC, objected to the confirmation of the plan, specifically opposing the plan's release and extinguishment provisions. However, after a three-day hearing, the District Court approved the Debtors' Reorganization Plan and issued the Confirmation Order on December 30, 1999. Making specific reference to the Haskell Alabama Action and creditors' claims against nondebtor third parties, Paragraphs 50, 51, and 52 of the District Court's Confirmation Order provide:

> 50. As of the Effective Date, any and all avoidance claims owned by or vested in the Debtors and Debtors in Possession under sections 502(d), 544, 545, 547, 548, 549, 550 and 551 of the Bankruptcy Code, including, without limitation, all of the avoidance claims that are owned by or vested in the Debtors and Debtors in Possession pursuant to the Bankruptcy Code and applicable provisions of law and that are asserted or could be asserted in the Haskell Alabama Action and the Huff Alabama Action, shall be extinguished whether or not then pending.

> 51. As of the Effective Date, any and all alter-ego or derivative claims owned by or vested in the Debtors and Debtors in Possession, including, without limitation, all of the alter-ego or derivative claims that are owned or vested in the Debtors and Debtors in Possession pursuant to the Bankruptcy Code and applicable provisions of law and that are asserted or could be asserted in the Haskell Alabama Action and the Huff Alabama Action, shall be extinguished whether or not then pending.

> 52. Nothing contained in paragraphs 50 or 51 of this Confirmation Order or in Sections 9.3(a) and 9.3(b) of the Plan shall be construed to extinguish, limit or bar any direct, personal and non-derivative claim which may be asserted against nondebtor third parties by creditors in their individual capacity or for the benefit of other similarly situated creditors; provided , however,

6

> that, notwithstanding the foregoing, creditors may not assert against nondebtor third parties any claims that are owned by or vested in the Debtors and Debtors in Possession and extinguished pursuant to Sections 9.3(a) and 9.3(b) of the Plan (as such Section is incorporated in paragraphs 50 and 51 of this Confirmation Order).

App. VIII, at 2027-28 (emphasis added). The clear language of the Confirmation Order specifically provides that the fraudulent transfer claims asserted in the Haskell Alabama Action are extinguished pursuant to Section 9.3 of the Reorganization Plan and cannot be asserted by creditors against third parties. Further, Paragraph 54 of the Confirmation Order permanently enjoins:

> all entities who have held, hold or may hold Claims
> against or Equity Interests in any or all of the Debtors
> from . . . commencing or continuing in any manner any
> action or other proceeding of any kind with respect to
> any claims and Causes of Action that are extinguished
> or released pursuant to the Plan or this Confirmation
> Order, including, without limitation, the claims
> extinguished pursuant to Section 9.3 of the Plan . .. .

App. VIII, at 2029.

Huff and HSBC appealed from the District Court's order
confirming the Reorganization Plan, challenging three
separate releases of legal claims included in the plan.
Haskell did not join in that appeal. On September 18, 2000,
we affirmed the District Court's Confirmation Order in In re
PWS Holding Corp., 228 F.3d 224 (3d Cir. 2000). 2

_____

2. In PWS Holding Corp., we observed that the District Court concluded
that the claims were extinguished for the following three reasons:

> First, [the District Court] was persuaded by the Examiner's
> conclusion that there was a low likelihood of recovery on the claims.
> . . . Second, the Court concluded that the potential cost to the
> estate of prosecuting the action and defending and paying
> indemnification claims, cross claims, and counterclaims arising out
> of the prosecution was high. Third, the Court believed that there
> was some likelihood that the Banks and the subordinate
> noteholders, as participants in the leveraged recapitalization, would
> be estopped from recovering on the claims.

On January 10, 2000, Haskell moved for an order to alter
or amend the Confirmation Order so as to require deletion
of the extinguishment and injunctive provisions pertaining
to the claims asserted in the Haskell Alabama Action. At a
hearing on January 20, 2000, the District Court denied
Haskell's motion to alter or amend. Because Haskell then
resumed the prosecution of the Haskell Alabama Action,
the Debtors filed a motion on April 3, 2000 to enforce the
Confirmation Order and specifically to enjoin Haskell's
prosecution of extinguished claims. On April 26, 2000,
Haskell filed an amended and restated complaint in the
Haskell Alabama Action. The restated complaint alleges
seven counts, including four premised upon the argument
that the leveraged recapitalization was a fraudulent transfer
under Alabama state law.3

On December 7, 2000, the District Court granted the
Debtors' motion to enforce the Confirmation Order of
December 30, 1999 and to enjoin the prosecution in the
Haskell Alabama Action of the four counts premised upon
Haskell's fraudulent transfer claims. The District Court
further ordered that Haskell pay the costs, including
reasonable attorneys' fees, associated with that proceeding.

Haskell timely appeals from the December 7, 2000 order

of the District Court.

II.

The District Court had jurisdiction to hear and determine

228 F.3d at 239. We ultimately found that "[t]he Examiner's and the District Court's conclusions that the claims were unlikely to succeed and were potentially costly to pursue are legally and factually supported." Id. at 242.

3. Count I of the restated complaint alleges fraudulent transfer claims under the AUFTA. Count IV claims that the defendants breached their fiduciary duties to the subordinated noteholders by approving the leveraged recapitalization. Count V alleges that the defendants conspired to cause Bruno's to make fraudulent transfers. Finally, Count VI asserts that the defendants joined and rendered substantial assistance in causing Bruno's to violate the AUFTA by making fraudulent transfers.

the Debtors' motion to enforce the Confirmation Order pursuant to 28 U.S.C. S 1334. We exercise jurisdiction under 28 U.S.C. S 1291. Although we review a district court's factual findings only for clear error, we exercise plenary review over any legal determinations. Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc. , 267 F.3d 340, 346 (3d Cir. 2001); In re O'Dowd, 233 F.3d 197, 201-02 (3d Cir. 2000).

III.

Fraudulent conveyance law aims "to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away." Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV, 229 F.3d 245, 250 (3d Cir. 2000) (citing In re Cybergenics Corp., 226 F.3d 237, 241-42 (3d Cir. 2000)). The Uniform Fraudulent Transfer Act, as adopted in Alabama, provides that the transfer of an asset or an interest in an asset is fraudulent as to a creditor if (1) "the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer" and (2) the debtor "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or "[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." Ala. Code 1975, S 8-9A-4. Among the remedies that the AUFTA affords creditors is the "[a]voidance of the transfer to the extent necessary to satisfy the creditor's claim." Ala. Code 1975, S 8-9A-7.

Both the Reorganization Plan and the Confirmation Order specifically identify "all avoidance claims" asserted in the "Haskell Alabama Action," such as those available under the AUFTA, as "extinguished." Haskell points out, however,

that the AUFTA provides a direct right of action to creditors, and not to the grantors of a fraudulent conveyance. 4

---

4. The following are the relevant provisions of the AUFTA that describe a creditor's remedies:

Because the AUFTA claims do not belong to Bruno's bankruptcy estate, Haskell argues that the extinguishment provisions in the Reorganization Plan and Confirmation Order do not bar him from prosecuting fraudulent transfer claims in the Haskell Alabama Action. The fatal flaw in Haskell's argument, however, is that it fails to consider properly the interplay between claims under the AUFTA and the Bankruptcy Code.

The relevant provision of the Bankruptcy Code in this case is 11 U.S.C. S 544(b). Section 544(b) provides that, upon commencement of a case under the Bankruptcy Code, a trustee or debtor in possession "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable" under the Bankruptcy Code.5 11 U.S.C. S 544(b). In other

---

S 8-9A-7. Remedies of creditors.

(a) In an action for relief against a transfer under this chapter, the remedies available to creditors, subject to the limitations in Section 8-9A-8, include:

(1) Avoidance of the transfer to the extent necessary to satisfy the creditor's claim . . . .

S 8-9A-8 Defenses, liability, and protection of transferee.

. . .

(b) Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under Section 8-9A-7(a)(1), the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c), or the amount necessary to satisfy the creditor's claim, whichever is less, or judgment for conveyance of the asset transferred. The judgment may be entered against:

(1) The first transferee of the asset or the person for whose benefit the transfer was made . . . .

Ala. Code 1975, SS 8-9A-7 and 8-9A-8.

5. Although S 544(b) does not make reference to the "debtor in possession," the Bankruptcy Code generally gives the "debtor in possession" the powers and duties of a trustee. 11 U.S.C. S 1107(a). Thus, the two terms are "essentially interchangeable." In re Cybergenics Corporation, 226 F.3d 237, 243 (3d Cir. 2000).

words, S 544(b) places the debtor in possession in the shoes of its creditors, giving it the right to prosecute individual creditors' fraudulent transfer claims for the benefit of the bankruptcy estate. This provision of the Bankruptcy Code is consistent with its objective of equitable distribution. See N.L.R.B. v. Martin Arsham Sewing Co., 873 F.2d 884, 888 (6th Cir. 1989) (noting that "[t]o allow a creditor of the bankrupt to pursue his remedy against third parties on a fraudulent transfer theory would undermine the Bankruptcy Code policy of equitable distribution by allowing the creditor 'to push its way to the front of the line of creditors' " (quoting In re Cent. Heating & Air Conditioning, Inc., 64 B.R. 733, 737 (N.D. Ohio 1986)); see also Moore v. Bay, 284 U.S. 4, 5 (1931) (observing that what is recovered for benefit of bankrupt's estate is to be distributed in equal parts among allowed unsecured claims that lack priority).

Haskell contends that he has the right to assert his fraudulent transfer claims despite the language inS 544(b). He frames the issue in terms of ownership, focusing upon whether the fraudulent transfer claims belong to the Debtors. He makes reference to our previous decision in In re Cybergenics Corp., 226 F.3d 237 (3d Cir. 2000), in which we stated, "The fact that section 544(b) authorizes a debtor in possession . . . to avoid a transfer using a creditor's fraudulent transfer action does not mean that the fraudulent transfer action is actually an asset of the debtor in possession . . . ." Id. at 243. Since creditors' actions under the AUFTA are not assets belonging to the Debtors, as Cybergenics makes clear, Haskell reasons that they are direct, non-derivative claims and, thus, unaffected by the extinguishment provisions in the Reorganization Plan and Confirmation Order. A closer analysis of our decision in Cybergenics demonstrates the flaws in Haskell's argument.

In Cybergenics, the debtor in possession, Cybergenics Corp., had sold all of its assets to a third party after filing for bankruptcy. Id. at 239. Subsequent to that, a group of Cybergenics' unsecured creditors sought leave from the Bankruptcy Court to bring a fraudulent transfer action on behalf of the bankruptcy estate.[6] Id. at 240. Those named

---

6. We note that the creditors in Cybergenics sought to bring a fraudulent transfer action under S 544(b) on behalf of the bankruptcy estate,

as defendants in the creditors' suit argued that the creditors could not bring the action because any fraudulent transfer claims had been transferred in Cybergenics' asset sale. Id. Agreeing that such claims had been sold in the asset sale, the District Court dismissed the creditors' complaint for lack of subject matter jurisdiction under

Federal Rule of Civil Procedure 12(b)(1). Id. at 240-41. We reversed the dismissal, holding that the fraudulent transfer claim was never an asset of Cybergenics, the debtor in possession. Id. at 245. Expounding on the debtor's power to avoid fraudulent transfers, we explained:

> The power to avoid the debtor's prepetition transfers and obligations to maximize the bankruptcy estate for the benefit of creditors has been called a "legal fiction" by one court. It puts the debtor in possession "in the overshoes" of a creditor. This attribute is no more an asset of Cybergenics as debtor in possession than it would be a personal asset of a trustee, had one been appointed in this case. Much like a public official has certain powers upon taking office as a means to carry out the functions bestowed by virtue of the office or public trust, the debtor in possession is similarly endowed to bring certain claims on behalf of, and for the benefit of, all creditors.

Cybergenics, 226 F.3d at 243-44 (internal citations omitted).

In arguing that his claims as a noteholder were not extinguished under the Reorganization Plan and Confirmation Order, Haskell fixates upon our conclusion in Cybergenics that fraudulent transfer claims do not

_____

whereas, in this case, Haskell seeks to bring his claims directly under the AUFTA, not derivatively through the debtor's power to assert fraudulent transfer claims under S 544(b). After the Supreme Court's holding that only a trustee or debtor-in-possession is empowered to invoke S 506(c) of the Bankruptcy Code in Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 9 (2000), there is some doubt as to whether a creditor can act derivatively in the debtor's stead to invoke S 544(b). However, because Haskell does not seek to invoke S 544(b), we are not confronted by that issue in this case.

12

constitute assets of the debtor in possession. In doing so, however, he neglects to consider the well-established rule under S 544(b) that we reaffirmed in Cybergenics, namely, that "a debtor in possession is empowered to pursue . . . fraudulent transfer claims for the benefit of all creditors." Id. at 245. Unlike in Cybergenics, the debtor in possession in this case, after thoroughly investigating and evaluating the potential fraudulent transfer claims, explicitly extinguished all such claims in its Reorganization Plan. The District confirmed the Reorganization Plan in its December 7, 1999 order, which we then affirmed in PWS Holding Corp., 228 F.3d at 250. Much as a party might decide to resolve a claim by reaching an out-of-court settlement, Bruno's resolved the fraudulent transfer claims here by extinguishing them. In contrast, the debtor in Cybergenics merely completed a sale of its assets. It did not exercise its power under S 544(b) to resolve potential fraudulent transfer claims, as did the debtor in this case.

Haskell had the opportunity to contest the extinguishment of the fraudulent transfer claims, but his objections were overruled by the District Court through its Confirmation Order, from which he did not file an appeal. Because Bruno's validly and effectively extinguished all potential fraudulent transfer claims arising from the leveraged recapitalization, Haskell is precluded from now prosecuting those claims in Alabama state court. They have been resolved.

Accordingly, we will affirm the District Court's order enforcing its previous Confirmation Order and enjoining Haskell from continuing to prosecute the AUFTA-related claims asserted in the Haskell Alabama Action. Because we agree with the District Court that Haskell violated the Confirmation Order, we will also affirm the District Court's order that he pay the costs associated with obtaining the enforcement order.

IV.

For the foregoing reasons, we will affirm the order of the District Court in all respects.

13

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

14